Rost C. Olsen, Esq.
Nevada SBN 14410
*Address, Phone Number, and Email*
*Filed Under Seal Pending Court Order*

*Pro Se Plaintiff/Petitioner*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| ROST C. OLSEN,<br><br>        Plaintiff/Petitioner,<br><br>      v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION,<br><br>        Defendants/Respondents. | Case No.  3:26-cv-00543-ART-CSD<br><br>**MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiff/Petitioner, Rost C. Olsen ("Mr. Olsen"), in pro se, moves this Court for a narrow preliminary injunction enjoining the Defendants and their contracted loan servicers and other agents from removing Mr. Olsen's student loans from forbearance for the pendency of these proceedings. This Motion is supported by the following Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Defendant United States Department of Education ("DoEd") unilaterally placed Mr. Olsen's federally-held student loans in forbearance in September 2024 due to litigation

-1-

surrounding the Income Driven Repayment ("IDR") plan known as the Saving on a Valuable Education Plan (the "SAVE Plan"). Mr. Olsen's student loans remain in that forbearance currently.

During the forbearance, Mr. Olsen has attained eligibility to obtain discharge of his loans through what is commonly referred to as Public Service Loan Forgiveness Buyback ("PSLF Buyback"). Under Public Service Loan Forgiveness ("PSLF"), a borrower is entitled to the discharge of the balance of the outstanding principal and interest on their federally-held direct student loans after making 120 qualifying monthly payments. Under PSLF Buyback, if a borrower has had their loans in a PSLF-ineligible forbearance, the borrower maintained eligible public service employment, and obtaining credit for months in forbearance would result in the borrower reaching the 120-payment threshold, the borrower may obtain credit by paying what they would have paid during those months on an eligible IDR plan.

Mr. Olsen submitted a PSLF reconsideration request to buy back the 9 months he needs to achieve the 120 monthly payment threshold (the "Buyback Request"). as instructed by DoEd on its studentaid.gov website. DoEd has yet to provide a proposed Buyback Agreement, as stated on the studentaid.gov website. DoEd further states that it "cannot" use the formula for the SAVE Plan to calculate Buyback Agreements for the months Mr. Olsen seeks to buy back, despite no longer having any legal impediment to do so.

While awaiting DoEd to make the relatively simple calculations needed to provide the awaited proposed Buyback Agreement, DoEd sent student borrowers in the SAVE Forbearance (including Mr. Olsen) a notice stating that they have 90 days from July 1, 2026 to apply for and select another repayment plan. If a borrower does not take action in that time, DoEd states it will automatically place the borrower in the Standard Repayment Plan.

Mr. Olsen has obtained eligibility for PSLF Buyback, and has properly made his application for such. Mr. Olsen has saved funds and is prepared to pay the amount he has calculated based on what he would have paid on a qualifying repayment plan for the months he seeks to buy back. Indeed, Mr. Olsen stands ready and able to do his part to eliminate the need of Defendants to place his student loans in any repayment plan going forward. Placing his loans in repayment at this point will further complicate the accounting required in zeroing out his account, and cause harm to Mr. Olsen in that placing his loans in the Standard Repayment Plan will cause an undue financial hardship at a transitional point of time for his family.

The traditional factors for an injunction tip heavily in favor of granting the limited preliminary injunction Mr. Olsen seeks. The governing law is clear, and Mr. Olsen has a high likelihood of success on the merits in this matter. Mr. Olsen has a risk of irreparable injury should the injunction not issue, in that it could cause substantial financial strain at a sensitive time while he seeks to obtain a new house for his family in a timely manner and under favorable conditions.

The balance of equities strongly favor Mr. Olsen in that granting the proposed injunction would merely maintain the status quo–which has been in place for two years–through the pendency of this action. This would cause no meaningful harm to Defendants, whereas removing these student loan accounts from forbearance while these proceedings are pending will cause significant financial strain on Mr. Olsen and his family, even if the Defendants at some point in the future refund any amount Mr. Olsen is deemed to have overpaid. In other words, this would mitigate any further harm to Mr. Olsen, as well as any future burden the Defendants would have to refund Mr. Olsen.

Finally, this injunction would be in the public interest as it would be narrow in scope and limited only to the parties in this action and their agents. By maintaining the status quo now, it

would prevent Defendants from incurring any further duties owed to Mr. Olsen, allowing them the ability to serve other borrowers efficiently.

For these reasons, Mr. Olsen respectfully requests this Court enter an injunction to preserve the established status quo and enjoin Defendants and their agents from removing his federally-held student loans from forbearance until these proceedings conclude.

## II.    FACTUAL BACKGROUND

In July of 2016, Mr. Olsen executed a DoEd-approved Master Promissory Note ("MPN") consolidating his existing student loans into Consolidated Direct Loans. Exh. 1 – Declaration of Rost C. Olsen In Support of Motion for Preliminary Injunction at ¶ 5;  Exh. 2 – Master Promissory Note at Pltf. 0010-26 (authenticated in Exh. 1 at ¶ 5). In October 2023, Mr. Olsen certified his income as required by DoEd to enroll in the SAVE Plan, using his 2022 tax return information. Exh. 3 – Screenshot of Recertification Summary from studentaid.gov at Pltf. 0027-28 (authenticated in Exh. 1 at ¶ 6). Applying Mr. Olsen's income information to the SAVE Plan formula resulted in a monthly payment of $181.17. *See id.* Mr. Olsen's household size has remained the same since this certification, with Mr. Olsen and his wife having one dependent child. Exh. 1 at ¶ 7.

Due to litigation surrounding the SAVE Plan, Mr. Olsen's student loans have been in a PSLF-ineligible forbearance since September 2024 (the "SAVE Forbearance"), with his account being paid ahead by $362.34.[1] *See* Exh. 4 – Screenshots of Mr. Olsen's PSLF Qualifying Payment Summary, obtained from studentaid.gov and MOHELA Payment History Summary at Pltf. 0029-

---

[1] Due to confusion surrounding a PSLF-eligible processing forbearance due to MOHELA upgrading its platform in or around May and June 2024, Mr. Olsen paid ahead two months where no payment was required. Exh. 1 at ¶ 8; *see also* Exh. 4. Additionally, with confusion surrounding the prospect of litigation around the SAVE Plan, Mr. Olsen also submitted a payment recalculation request, which resulted in another two-month forbearance that was PSLF eligible for the months of July and August 2024. *See* Exh. 1 at ¶ 9, 34 CFR § 685.205(b)(9) *and* .219(c)(2)(v)(H).

-4-

32 (authenticated in Exh. 1 at ¶ 9); *see also Missouri v. Biden*, 112 F.4th 531 (8th Cir. 2024) *and Missouri v. Trump*, 128 F.4th 579 (8th Cir. 2025).

During the SAVE Forbearance, DoEd, through its servicer MOHELA, sent Mr. Olsen two letters, twice delaying the date by which he had to recertify his income for purposes of recalculating his monthly student loan payment, ultimately until October 24, 2027. Exh. 5 – Letters Delaying Recertification, Feb. 22, 2025 & Oct. 11, 2025 at Pltf. 0033-37 (authenticated in Exh. 1 at ¶ 6). Due to issues pertaining to all IDR plans (not just the SAVE Plan), it appears these delays applied to all borrowers in IDR plans, regardless of whether those borrowers' repayment plans were enjoined or not. *See* Exh. 6 – Screenshot of Information from StudentAid.gov regarding Delaying of Recertification Deadlines, source URL: https://studentaid.gov/announcements-events/idr-court-actions at Pltf. 0038-39 (accessed January 6, 2026) (authenticated in Exh. 1 at ¶ 11).

In April, 2026, Mr. Olsen certified past periods of employment resulting in DoEd acknowledging he has attained 111 of the needed 120 monthly payments toward PSLF. Exh. 7 – PSLF Qualifying Payment Update sent from DoEd to Mr. Olsen, April 6, 2026 at Pltf. 0040-42 (authenticated in Exh. 1 at ¶ 12). Needing only 9 more months of payment credit, and his loans having been in the SAVE Plan Forbearance for more than 9 months, Mr. Olsen submitted a request to discharge his student loans through the PSLF Buyback process, which DoEd acknowledged. Exh. 8 – Email Confirming Receipt of Mr. Olsen's Buyback Request at Pltf. 0043-45 (authenticated in Exh. 1 at ¶ 13). Mr. Olsen has maintained PSLF-eligible employment throughout the SAVE Forbearance. *See* Exh. 9 – Employment Certification Forms at Pltf. 0046-52 (authenticated in Exh. 1 at ¶ 14).

Meanwhile, DoEd has asserted on its website that it "cannot" use the SAVE Plan as the basis for PSLF Buyback Agreements for buying back periods of time after July 1, 2024. *See* Exh. 10 – Screenshot from StudentAid.gov regarding use of SAVE Plan, source URL: https://studentaid.gov/announcements-events/idr-court-actions at Pltf. 0053-54 (accessed April 13, 2026 and July 20, 2026) (authenticated in Exh. 1 at ¶ 15).

Approximately 45 days after submitting his PSLF Buyback request, Mr. Olsen had received no correspondence regarding the status of that request. Exh. 1 at ¶ 16. With no response from DoEd regarding his request, and having heard anecdotally of exorbitant wait times for this relatively simple process, Mr. Olsen sent a legal demand letter to DoEd requesting they process his PSLF Buyback request utilizing the simple calculations he provided. Exh. 11 – Legal Demand Letter from Mr. Olsen to DoEd, May 28, 2026 (exhibits thereto omitted) at Pltf. 0055-61 (authenticated in Exh. 1 at ¶ 17); *see also* Exh. 1 at ¶ 16. Mr. Olsen has yet to receive any response to his demand letter, which resulted in him filing the underlying suit. Exh. 1 at ¶ 18.

Despite being eligible for PSLF Buyback and having a request pending, DoEd, through their servicer MOHELA has nonetheless sent Mr. Olsen, and presumably other borrowers, automated emails stating that the borrowers "must" select a new repayment plan, and that they have 90 days from July 1, 2026 to do so. Exh. 12 – Emails from MOHELA to Mr. Olsen, July 1-2, 2026 at Pltf. 0062-70 (authenticated in Exh. 1 at ¶ 19).

The correspondence further states that, should a borrower not select a new repayment plan in that timeframe, then the borrower will be placed on either the Standard Repayment Plan or Tiered Standard Plan. *Id.* Should Mr. Olsen's loans be placed into the Standard Repayment Plan, utilizing the repayment calculator tool on StudentAid.gov, Mr. Olsen's loan payment would be approximately $2,476. Exh. 13 – Screenshot from StudentAid.gov upon using Repayment

Calculator Tool, source URL: https://studentaid.gov/repayment-calculator/plan-options (accessed August 3, 2026) at Pltf. 0072 (authenticated in Exh. 1 at ¶ 20).[2]

Mr. Olsen reached out to MOHELA, the DoEd's servicer who handles Mr. Olsen's loan accounts on or about July 21, 2026 requesting his accounts be left in forbearance pending the processing of his PSLF Buyback Request. Exh. 14 – Screenshot of MOHELA Correspondence at Pltf. 0074-76 (authenticated in Exh. 1 at ¶ 21). MOHELA responded with a canned answer that did not directly address Mr. Olsen's request, other than to say that those in the SAVE Forbearance will have to enter repayment. *See id.*

Meanwhile, Mr. Olsen and his family are seeking to obtain a new residence within the next 9-18 months that more adequately meets their needs, particularly those of their young daughter with special needs. Exh. 1 at ¶¶ 22-26.

As obtaining the relief sought in this suit would obviate the need for Mr. Olsen's loans to enter repayment, and the potential repayment amounts are up to approximately 14 times larger than Mr. Olsen's previous payments, Mr. Olsen now moves for a preliminary injunction to maintain the status quo pending outcome of this suit.

## III.    LEGAL STANDARD

A preliminary injunction is appropriate to preserve the status quo pending final determination of an action. *See Textile Unlimited, Inc. v. A. BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001). Under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008), a party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits of

---

[2] Of note, should Mr. Olsen choose another repayment plan before the expiration of the 90-day period, just one month of Mr. Olsen's least expensive available payment plan would be only $4 less than what he calculates he would owe to buy back the nine months he is entitled to buy back under the SAVE Plan Formula. *Compare* Exh. 13 at Pltf. 0073 (the Repayment Assistance Plan yielding a monthly payment of $1,264) *with* Exh. 11 at Pltf. 0057 (showing calculations yielding a PSLF Buyback amount of $1,268.19 to buy back nine months based on prior payments).

the case; (2) a likelihood of irreparable harm in absence of injunctive relief; (3) the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest.

The Ninth Circuit uses a "'sliding scale' approach to preliminary injunctions." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under that framework, when "serious questions going to the merits" exist, but the balance of equities tip sharply toward the moving party, such circumstances can justify the issuance of a preliminary injunction, "so long as the [moving party] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021).

## IV.   DISCUSSION

As set forth below, Mr. Olsen satisfies both the traditional *Winter* test and Ninth Circuit's sliding scale standard.

### A. Mr. Olsen is likely to succeed on the merits

#### 1. Administrative Procedure Act Claims

##### a)   Unlawful Withholding of Agency Action (5 U.S.C. § 706(1))

Under the Administrative Procedure Act, a reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "[W]hen an agency refuses to accept, in any form, a request that it take a required action, it has 'withheld' that duty within the meaning of § 706(1)." *Al Otro Lado v. Exec. Office for Immgr. Rev.*, 138 F.4th 1102, 1122 (9th Cir. 2025), *overruled on other grounds by Mullin v. Al Otro Lado,* 609 U.S. --- (2026); *see also Viet. Veterans of America v. CIA*, 811 F.3d 1068, 1079 (9th Cir. 2016) (treating as withholding a "situation where a federal agency refuses to act in disregard of its legal duty to act").

By statute, the Secretary of Education is mandated to cancel the remaining balance of principal and interest due on a borrower's student loans once the borrower makes 120 qualifying payments while employed in eligible public service. 20 U.S.C. § 1087e(m)(1). Under accompanying regulations, DoEd established the PSLF Buyback mechanism, allowing borrowers to receive PSLF credit for months spent in PSLF-ineligible forbearances provided that: (1) the borrower held qualifying employment; (2) the buyback payment equals or exceeds what would have been paid under an eligible IDR plan; and (3) crediting those months results in the borrower reaching the 120-payment threshold. 34 C.F.R. § 685.219(g)(6).

Here, Mr. Olsen has satisfied every regulatory prerequisite: he has 111 certified qualifying payments, maintained qualifying employment throughout his forbearance, and needs only 9 months to hit 120 payments. *See* Exh.'s 7, 9 at Pltf. 0041-42, 0047-52. However, Defendants have refused to perform the required buyback calculation, asserting on StudentAid.gov that they "cannot" use the SAVE Plan formula to calculate buyback agreements for periods after July 1, 2024. Exh. 10 at Pltf. 0054.

This assertion is legally false. The preliminary injunction surrounding the SAVE Plan was dissolved upon resolution of the underlying litigation. *See Missouri v. Trump*, 2026 WL 696770 (8th Cir. 2026). While the resulting settlement agreement prohibits *prospective* enrollment in SAVE, nothing in that agreement prohibits calculating retroactive buyback amounts for periods between July 1, 2024, and March 2026 using the formula in effect during those months. *See* Exh. 15 – Settlement Agreement Resolving *Missouri v. Trump*, E.D. Missouri, case no. 4:24-cv-520-

JAR at Pltf. 0077-85, accessed at https://www.ed.gov/media/document/missouri-settlement-112689.pdf.[3]

By flatly refusing to accept or apply the lowest eligible IDR formula Mr. Olsen was entitled to during that timeframe, Defendants have unlawfully withheld mandatory agency action under 34 C.F.R. § 685.219(g)(6) and 5 U.S.C. § 706(1).

### b) *Unreasonable Delay of Agency Action*

Defendants have also unreasonably delayed processing Mr. Olsen's Buyback Request. In assessing unreasonable delay under the APA, courts apply the six so-called *TRAC* factors: (1) rule of reason; (2) statutory/congressional timetables; (3) impact on human health and welfare; (4) competing agency priorities; (5) nature of prejudiced interests; and (6) agency bad faith. *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984); *Vaz v. Neal*, 33 F.4th 1131, 1137 (9th Cir. 2022) (*"TRAC"*).

• Rule of Reason & Processing Rates: There is no discernable rule of reason governing DoEd's backlog. While DoEd possesses all necessary historical income and employment records to run a basic math calculation, public records in related litigation, *American Federation of Teachers v. U.S. Department of Education*, 1:25-cv-00802 (D.D.C. 2025) ("*AFT*"), reveal DoEd processes roughly 3,073 buyback requests per month across its entire system—an extraordinarily sluggish rate of approximately 1.5 calculations per agency employee per month. *See* Exh. 16 – Summary of PSLF Buyback Requests Backlog from *AFT* at Pltf. 0086-87

---

[3] Mr. Olsen respectfully requests the Court take judicial notice of the authenticity of this document. Located on the DoEd's website, its authenticity "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2).

(authenticated in Exh. 1 at ¶ 29)[4]; Exh. 17 – Status Reports from *AFT* at Pltf. 0088-131 (authenticated in Exh. 1 at ¶ 29).[5]

For comparison, the Internal Revenue Service processed over 144 million tax returns by May 8, 2026, an average of 36 million tax returns per month, despite a basic 1040 having far more complexity than a Buyback Request. Exh. 18 – IRS Filing Statistics for Week Ending May 8, 2026 at Pltf. 0132-34.[6] Even when accounting for the difference in size of the agencies (the IRS has roughly 73,000 employees, compared to DoEd's approximately 2,000 employees), the IRS still processed approximately 493 tax returns per employee per month according to that data. Exh. 19 – Screenshot of Office of Personnel Management Data, source URL: https://data.opm.gov/explore-data/analytics/workforce-size-and-composition, accessed August 3 & 4, 2026 at Pltf. 135-37 (authenticated at Exh. 1 at ¶ 31).[7]

• Human Health, Welfare, and Prejudice: Although Congress did not set a rigid statutory deadline for buyback processing, the delay directly threatens the economic stability and physical welfare of Mr. Olsen's family. Holding Mr. Olsen's account in limbo while threatening to force him into a $2,476/month Standard Repayment Plan artificially inflates his debt obligations, harms his credit profile, and directly impedes his ability to secure housing tailored to his special-

---

[4] Mr. Olsen seeks to admit Exhibit 16 under Fed. R. Evid. 1006(a) as a summary to prove the content of the *AFT* status reports included in Exhibit 17.

[5] Mr. Olsen respectfully requests the Court take judicial notice of these documents filed in *AFT*. Located on PACER, their authenticity "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2).

[6] Mr. Olsen respectfully requests the Court take judicial notice of the authenticity of this document. Located on the IRS's website at https://www.irs.gov/newsroom/filing-season-statistics-for-week-ending-may-8-2026, its authenticity "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2).

[7] Mr. Olsen respectfully requests the Court take judicial notice of the information contained in this document. Located on the Office of Personnel Management's website at https://data.opm.gov/explore-data/analytics/workforce-size-and-composition, its authenticity "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2).

needs daughter. *Compare* Exh. 3 at Pltf. 0028 *with* Exh. 12 at Pltf. 0063, 67, Exh. 13 at Pltf. 0072, *and* Exh. 14 at Pltf. 0075-76; *see also* Exh. 1 at ¶¶ 22-26.

• <u>Competing Priorities & Bad Faith</u>: Calculating a 9-month buyback based on existing tax data requires minimal agency bandwidth and creates no administrative disruption. Refusing to perform basic mathematical duties while simultaneously issuing 90-day ultimatums forcing borrowers into exorbitant repayment plans reflects arbitrary agency action bordering on bad faith. *See* Exh. 12 at Pltf. 0063, 67; *see also* Exh. 14 at Pltf. 0075-76.

### 2. Contract Law Claims

When Mr. Olsen executed his MPN in July 2016, he entered into a binding contract with DoEd. The statutory and regulatory terms governing Direct Loans—including PSLF statutory cancellation under 20 U.S.C. § 1087e(m) and its implementing regulations—form essential terms of that agreement. *See* Exh. 2 at Pltf. 0026 (incorporating PSLF into the Agreement).

By administrative delay, recertification extensions, and unilateral forbearance placements, Defendants created a contractual expectation that Mr. Olsen could satisfy his loan obligations via the statutory PSLF process and the regulatory Buyback process. Mr. Olsen performed his end of the bargain: he maintained qualifying public service, certified 111 payments, saved necessary funds, and timely submitted his Buyback Request. Defendants' insistence on terminating forbearance and demanding monthly payments as much as roughly 14 times higher ($2,476 vs. $181.17) prior to resolving his pending discharge request constitutes a breach of the governing loan agreement and the implied covenant of good faith and fair dealing. *Compare* Exh. 3 at Pltf. 0028 *with* Exh. 12 at Pltf. 0063, 67 *and* Exh. 14 at Pltf. 0075-76.

///

///

### B.  Mr. Olsen will suffer irreparable harm absent injunctive relief

Absent a preliminary injunction maintaining the status quo forbearance, Mr. Olsen faces immediate, non-speculative, and irreparable injury.

Defendants have issued a direct ultimatum: select a new repayment plan within 90 days of July 1, 2026, or be placed into a Standard Repayment Plan requiring approximately $2,476 per month—a 14-fold increase over his $181.17 SAVE payment. *See* Exh. 12 at Pltf. 0063, 67 *and* Exh. 14 at Pltf. 0075-76. Requiring immediate outlay of exorbitant monthly payments for loans that Mr. Olsen has already earned the right to fully discharge via buyback imposes a severe cash-flow shock. While financial loss alone is sometimes reparable, economic harm constitutes irreparable injury where it threatens solvency, disrupts family welfare, or causes cascading real-world consequences that retroactive monetary refunds cannot remedy.

Here, Mr. Olsen and his family are actively seeking to purchase a residence over the next 12–18 months specifically suited to the needs of their young, special-needs daughter. *See* Exh. 1 at ¶¶ 22-26. Forcing Mr. Olsen's loans into active repayment at $2,476 per month will artificially distort his debt-to-income ratio, severely alter his creditworthiness, and jeopardize his ability to obtain mortgage financing during a critical family transition. *See id.*

Should Defendants later acknowledge their administrative delay and refund overpayments months or years down the road, that money cannot un-do lost real estate opportunities or reverse housing instability endured by a special-needs child. Because monetary damages after the fact cannot fully restore the missed housing opportunities or remedy the immediate family strain, the threat of irreparable harm is clear and concrete.

///

///

### C.  The balance of equities tip sharply in Mr. Olsen's favor

Under the Ninth Circuit's sliding-scale framework, a preliminary injunction is strongly warranted where the balance of hardships tips sharply in the movant's favor. *Cottrell*, 632 F.3d at 1131.

If injunctive relief is denied, Mr. Olsen faces financial distress, severe cash-flow disruption, impaired credit, and derailed housing plans for his family—all while awaiting an administrative calculation DoEd is legally required to perform. However, if the injunction is granted, Defendants suffer zero meaningful harm. The proposed preliminary injunction merely preserves the status quo forbearance that Defendants themselves implemented and maintained for two years. Preserving forbearance costs Defendants nothing, creates no administrative burden, and prevents the systemic inefficiency of placing loan accounts into forced repayment only to reverse those actions and process refunds later.

The equity of holding loan enforcement in abeyance while the agency processes a pending discharge request tips overwhelmingly in Mr. Olsen's favor.

### D.  A narrowly-tailored preliminary injunction is in the public interest

Further, granting preliminary relief serves the public interest in two distinct ways.

One, the public has a strong interest in ensuring federal administrative agencies abide by their governing statutes, follow their own regulations, and process statutory benefit requests fairly and efficiently without imposing arbitrary administrative penalties on the public.

And two, the requested injunction is strictly tailored to the immediate parties. It applies solely to Mr. Olsen's federally held student loans, enjoining Defendants and their agents from removing his loans from forbearance while these proceedings play out. It does not enjoin broader

DoEd operations or interfere with general student loan administration, making it a minimal-impact remedy that preserves judicial efficiency.

## V. CONCLUSION

Mr. Olsen has performed every obligation required to earn full discharge of his student loans under the PSLF program. Rather than completing a straightforward administrative calculation to process his Buyback Request, Defendants have arbitrarily issued a 90-day ultimatum threatening to force his account into an exorbitant $2,476 monthly repayment plan.

Preliminary injunctive relief is necessary to prevent severe, irreversible disruption to Mr. Olsen's family and housing stability while this Court resolves the underlying claims. Because Mr. Olsen has demonstrated a high likelihood of success on the merits, irreparable injury, and a favorable balance of equities and public interest, maintaining the long-standing status quo forbearance is fully justified.

Accordingly, Mr. Olsen respectfully requests that this Court grant his Motion for Preliminary Injunction and enter an order enjoining Defendants, their contracted loan servicers, and their agents from removing Mr. Olsen's student loans from forbearance until these proceedings conclude.

Dated this 6th day of August, 2026.

ROST C. OLSEN

_____/s/ Rost C. Olsen_____

Rost C. Olsen, Esq.
Nevada SBN 14410
Plaintiff/Petitioner In Pro Se